1
2
3
4
5
6
7
8
9
10          IN THE UNITED STATES DISTRICT COURT
11        FOR THE SOUTHERN DISTRICT OF CALIFORNIA
12
13   **RAY ALLEN COLES,**                CASE NO. 13-CV-211-JLS-(PCL)

14                        Petitioner,    **REPORT AND
                                         RECOMMENDATION OF U.S.
15        **v.**                         MAGISTRATE JUDGE RE:**

16                                       **PETITION FOR WRIT OF HABEAS
                                         CORPUS**
17   **ELVIN VALENZUELA, Warden,
     California Men's Colony,**          **[Doc. No. 1]**
18
                          Respondent.
19                                               **I.**

20                                       **INTRODUCTION**

21        Ray Allen Coles ("Petitioner"), a state prisoner proceeding *pro se*, has filed a

22   Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging his San

23   Diego Superior Court conviction in case No. SCD220436 for battery with the

24   infliction of great bodily injury, Cal. Penal Code § 243(d). (Lodgment 1 at 258.) The

25   court sentenced Petitioner to nine years in state prison. (Id.)

26        Petitioner alleges violations to his constitutional right to a jury trial under the

27   Sixth Amendment, and his right to due process under the Fourteenth Amendment.

28   [Doc. No. 1.] The Court has considered Petitioner's Petition, Respondent's Answer

and Memorandum of Points and Authorities in support thereof, Petitioner's Traverse, Petitioner's Letter of Supplemental Authorities Pursuant to Federal Rule of Appellate Procedure 28(j), and all supporting documents submitted by the parties. For the reasons set forth below, the Court recommends that the Petition be **DENIED**.

## II.

## FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct. Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The facts of the underlying crime, as found by the state appellate court, are as follows:

> "On the night of the incident, Marcum, Kasprzak, the victim, and other friends had been drinking. In the early morning hours the group continued their activities at the victim's home in Pacific Beach, including using cocaine. At some point they decided to go get more cocaine. Defendant lived a few blocks away from the victim and Marcum knew he was a drug dealer. Marcum testified that she had purchased cocaine from defendant about five times, and about one month earlier he had furnished cocaine (at her request) during a trip to Miami.
>
> A short while before the incident, Marcum called defendant and told him they wanted to buy some cocaine, and defendant told her they could come over. At about 4:30 a.m., the victim drove Kasprzak and Marcum to defendant's home. Marcum got out of the car and stated she would be right back, while Kasprzak and the victim (who did not know defendant) stayed in the car. Marcum went upstairs to defendant's apartment, knocked on the door, and went inside the apartment.
>
> After about five or 10 minutes, the victim was concerned because Marcum had not returned. The door to defendant's apartment was ajar, and the victim got out of the car and called out Marcum's name a couple of times. There was no response, so he re-entered the car, and along with Kasprzak, dozed off. About 10 minutes later when Marcum still had not returned, the victim woke Kasprzak and told her he was going to go get Marcum. He went to the top of the stairs and called her name a couple of times.
>
> Marcum testified that she heard the victim calling for her while she was inside the apartment. Defendant asked who was out there and opened the apartment door. The victim asked Marcum if she was ready and told her they should go. Defendant said to the victim, "Quiet down. I live here." and Marcum told the victim she would be out in a minute. Defendant or Marcum then closed the apartment door. A couple of minutes later, Marcum heard the victim call for her again. According to the victim, at this point he was standing on

13-CV-211-JLS-(PCL)

the stairs about two steps from the top with his back toward the apartment door, and he was leaning with his 'butt' or 'right hip' on the stair handrail. Defendant came out of the apartment saying "[a]re you trying to wake up my fucking neighbors?" and then 'charged' him and hit him. The victim explained he was "completely shocked" at defendant's approach; when the door opened he turned around to look; before he could react he "got a fist right across" the left side of his face; and he "fell over the banister backwards." The victim testified he did not fall or roll down the steps but "just fell straight back" to the concrete about 12 to 15 feet below. The last thing he remembered before waking up in the hospital was "looking to the sky" and thinking he was going to die.

Marcum witnessed part of the incident from inside the apartment, and Kasprzak witnessed it from inside the car. According to Marcum, defendant was irate and he dashed out the door and yelled at the victim to be quiet. Defendant made a fist and "put his arm up in a threatening way." The victim had a "shocked look on his face" and started "backing down the stairs." Defendant was "in [the victim's] face," walking toward him. Marcum did not see what occurred next because the apartment door "slamm[ed]" shut. She heard voices yelling; a "punching" or "thump" noise; the sound of a rail making a noise; and then an "impact" noise like something "fell or hit into something and fell." She opened the door, ran down the stairs, and saw the victim lying on the ground on his back. Marcum testified she did not actually see defendant punch the victim, but she assumed he had done this because defendant "put his arm up and got in [the victim's] face and was yelling at him," and after the apartment door slammed shut she heard an "impact noise."

Kasprzak was sitting in the back seat of the car with the windows rolled up, and she was looking out at the victim through the front windshield of the car. According to Kasprzak the victim was walking back down the stairs after looking for Marcum; defendant then opened the apartment door; the victim turned around towards defendant; and defendant "[came] after" the victim. "[W]ithin an instant" of defendant coming out, defendant lunged forward and swung at the victim with his right arm; the victim "went flying over the railing" and hit his head on the pavement; and there was no time for the victim to respond. Kasprzak did not see the "direct contact" of defendant's hand connecting with the victim because the victim's back was blocking her view. However, she assumed that defendant either punched or pushed the victim and that the victim did not fall over on his own. She explained that she saw defendant raise his arms and swing at the victim; the victim did not fall down the stairs but "[i]nstantaneously" went flying over the railing; and the victim went over the railing with " a lot of force." She stated she did not know if defendant intended to cause the victim to go over the railing, but she believed he did intend to punch or push him.

The victim had fallen "straight on his head"; there was blood coming from his head; and his eyes were rolled back and wide open. Kasprzak ran over to the victim. Kasprzak was trying to get her cell phone to work and she told defendant they needed to call the police. Defendant grabbed both of Kasprzak's arms, shook her, and "with a

13-CV-211-JLS-(PCL)

lot of rage and panic" in his eyes told her she was not "going to call the fucking police." Kasprzak argued with defendant and said they had to. She then ran away from defendant around the corner of the building, trying to get her cell phone to work. Kasprzak testified she was afraid of defendant because he had committed a violent act of pushing the victim over and he had shaken her and told her not to call the police.

Marcum also came outside and tried to talk to the victim, but he was unresponsive. Marcum told defendant they needed to call 911, but defendant told her no. Defendant picked up the victim and put him in the front seat of the car so they could take him to the hospital. Kasprzak observed this and ran back to the car. When Marcum said she was going to drive the victim to the hospital, Kasprzak argued with her and defendant because she knew that Marcum was in no condition to drive and it "was just another accident waiting to happen." Kasprzak told them they needed to call the police, and defendant again grabbed her and shook her and said she was not going to do this. After defendant shook her, Kasprzak ran off again and was able to alert the police by flagging down a patrol car.

Meanwhile, Marcum was unable to manage the car's clutch, and so defendant ended up driving. As defendant was backing the car into the street, he was stopped by the police in response to a 911 call by a neighbor. Medical emergency personnel arrived and transported the victim by ambulance to the hospital. Based on the information provided by Kasprzak, the police arrested defendant at the scene.

Officer Nicholas Minx spoke to defendant on the night of the incident. Defendant told Officer Minx that he had an argument with the victim and during the argument he "chest-bumped" the victim. Defendant explained to Minx that chest-bumping means you "get real close" to the person and "puff out" your chest. Minx testified that he did not remember specifically speaking with defendant about whether he made contact with the victim, but when defendant stated that "he chest-bumped him or got close to chest-bumping him," Minx assumed there had been contact. When defendant was at the jail, Detective Gregory Olson told him what he was being charged with. Defendant responded spontaneously by saying, "I should not have touched that guy. I don't even know him." Defendant told Detective Olson that the victim was yelling "[Marcum, Marcum.] Where are you?", and defendant opened the door and grabbed the victim's shirt.

The victim was in the hospital for eight days. He suffered bleeding in his brain and a skull fracture, and he experienced vomiting, memory loss, loss of concentration and severe headaches. At the time of trial he had chronic upper-back pain.

Testifying on his own behalf, defendant stated that Marcum came to his home at about 5:00 a.m.; she was intoxicated; and she asked him to get her some ecstasy. He told her he could not do anything for her and she should not be coming over to his home at this time of night. When he heard the victim at the top of the steps yelling for Marcum, he was upset at the noise and went outside. Gesturing with his hands, defendant asked the victim what he was

13-CV-211-JLS-(PCL)

doing yelling outside his home and told him to "shut the F up." The victim looked as if he was under the influence and appeared to be shocked that defendant had come outside. Defendant walked towards the victim, and the victim started walking backwards to avoid defendant. The victim then "clipped over the rail, fell over backwards, arms in the air, not even trying to brace himself." Defendant testified that he never got closer than two to three feet from the victim; he never swung at, pushed, shoved or touched the victim; and he did not tell the police that he chest-bumped the victim or that he should not have touched the victim. Defendant acknowledged that he knew he should not have moved the victim because the victim had a head injury and that the proper thing to do would have been to call the police, but denied that he told Kasprzak not to call the police.

(Lodgment 5, at 2-8.)

## III.

## PROCEDURAL BACKGROUND

On March 23, 2010, a jury in San Diego County convicted Petitioner of battery with the infliction of great bodily injury, Cal. Penal Code § 243(d) & Cal. Penal Code § 1192.7(c)(8). (Lodgment 1 at 422.) Petitioner admitted he had one prior serious felony conviction, Cal. Penal Code § 667(a), and one strike conviction, Cal. Penal Code § 667.7(b). (Id. at 426.) On August 12, 2010, the court sentenced Petitioner to a term of nine years. (Id. at 258.)

On July 16, 2010, on a Motion for New Trial, the trial court considered new testimonial evidence from three additional defense witnesses. (Lodgment 14 at 1401-1632.) The three additional witnesses were Jason Gregory Turner (Petitioner's original trial counsel), Melanie Patterson (an acquaintance of Petitioner), and Alexandra Escajeda (an acquaintance of prosecution witness Shantele Marcum). (Id.) Mr. Turner testified about his performance as Petitioner's trial counsel, and specifically, his decision not to investigate and interview a potential witness, Melanie Patterson. Mr. Turner explained that Petitioner told him that there was a women in his room on the night of the incident. (Id. at 1428.) He further stated that Petitioner did not want this information to "see the light of day" presumably because it would harm the relationship he had with his fiancee. (Id.) Mr. Turner admitted that he should have investigated further but did not due in

13-CV-211-JLS-(PCL)

5

part to honor Petitioner's wishes. (Id.) Ms. Patterson testified that she was present in the apartment with Petitioner on the night of the incident. She stated that she had a good view of the Petitioner and victim, and from her vantage point, Petitioner made no contact with the victim and that he fell on his own. (Id. at 1448.) Ms. Escajeda testified about a telephonic conversation she had with Ms. Marcum on the night of the incident. (Id. at 1463.) She stated that Marcum called her from the hospital and wanted her to falsely state that she was present at Petitioner's house on the night of the incident, should anyone ask. (Id. at 1462-63.) She also testified that Marcum seemed more concerned about a dress she borrowed from her rather than the victim's condition. (Id. at 1464.)

After considering all testimony, the trial court found that Petitioner failed to satisfy his burden of establishing ineffective assistance of counsel. (Id. at 1621.) The court concluded, given all the evidence, the decision not to call Melanie Patterson was a tactical decision, and therefore, not ineffective assistance. (Id.) The court also found that failing to call Melanie Patterson was not prejudicial to Petitioner's case since her account of the incident was not that powerful. The court reasoned that Patterson was simply not as close to the scene as the other witnesses in the case. The court also rejected Petitioner's second basis for ineffective assistance of counsel - that counsel did not, or forgot to impeach Shantele Marcum with the prior statement she made to Escajeda. The court found that Marcum's statement "he went over the rail" serves little impeachment value since she didn't elaborate on her comment. (Id.) Furthermore, the court found that Marcum was already thoroughly impeached during the course of the trial. (Id.)

Petitioner filed a timely appeal to the California Court of Appeal, Fourth Appellate District, Division One, in case D057933, claiming, (1) ineffective assistance of trial counsel; (2) the trial court erred in refusing to instruct the jury on accident or misfortune; (3) the trial court erred by permitting the prosecutor to impeach him by questioning him about his prior drug procurement; (4) the trial

13-CV-211-JLS-(PCL)

court erred in failing to sustain his objection under California Evidence Code section 352, as to the prosecutor's questions about the prior drug procurement; (5) the trial court erred in instructing the jury on proximate causation; (6) the trial court's errors cumulated to deny him due process; and (7) the trial court abused its discretion in denying his motion for new trial. (Lodgment 2.) After considering the parties' briefs, (Lodgment 3, at 4) the appellate court issued an opinion affirming the judgment. (Lodgment 5.) On April 6, 2012 Petitioner petitioned the California Court of Appeal for a rehearing, (Lodgment 6.), which was denied on April 17, 2012. (Lodgment 7.) Petitioner then filed a petition for review in the California Supreme Court, case S202169, alleging the same claims raised in the California Court of Appeal. (Lodgment 8.) Petitioner also filed a petition for writ of habeas corpus in the California Supreme Court, case S202508, claiming ineffective assistance of trial counsel. (Lodgment 9, 10, 11.) On June 20, 2012, the Supreme Court of California denied the petition for review. (Lodgment 12.) On August 29, 2012, the Supreme Court of California denied the petition for writ of habeas corpus. (Lodgment 13.)

Petitioner filed his current Petition for Writ of Habeas Corpus with this Court on January 25, 2013 claiming, (1) he received ineffective assistance of trial counsel; (2) the trial court erred in refusing to instruct the jury on accident or misfortune; (3) the trial court erred by permitting the prosecutor to impeach him by questioning him about his prior drug procurement; (4) the trial court erred in instructing the jury on flight; (5) the trial court's errors cumulated to deny him a fair trial. [Doc. No. 1.] Respondent answered on March 26, 2013. [Doc. No. 5.] Petitioner filed a traverse on August 3, 2013. [Doc. No. 10.] Petitioner also filed a letter of supplemental authorities pursuant to Federal Rule of Appellate Procedure 28(j) on August 19, 2013. [Doc. No. 13.]

/ / /

/ / /

13-CV-211-JLS-(PCL)

# IV.

## SCOPE OF REVIEW

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  Federal habeas courts may not "reexamine state-court determinations on state-law questions."  Estelle v. McGuire, 502 U.S. 62, 68 (1991). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005); see Park v. California, 202 F.3d 1146, 1149-50 (9th Cir. 2000) ("a violation of state law standing alone is not cognizable in federal court on habeas").

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Petitioner's claims because he filed his federal habeas petition after that statute's 1996 effective date. Lindh v. Murphy, 521 U.S. 320, 322-23 (1997). AEDPA imposes a "'highly deferential standard for evaluating state-court rulings,'" requiring "that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (quoting Lindh, 521 U.S. at 333 n.7).  Habeas corpus is a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington v. Richter, 562 U.S. __, 131 S. Ct. 770, 786 (2011) (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." (Id. at 786-87.)

"AEDPA prevents defendants – and federal courts – from using federal

13-CV-211-JLS-(PCL)

habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico v. Lett</u>, 559 U.S. __, 130 S. Ct. 1855, 1866 (2010). "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." <u>Richter</u>, 131 S. Ct. at 784.  Habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>see</u> <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-76 (2003); <u>see also</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test). To be found an "unreasonable application" of the precedent, the state court decision must have been "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.'" <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003) (citations omitted).  The lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1).  <u>Carey v. Musladin</u>, 549 U.S. 70, 77 (2006).  "[W]hen a Supreme Court decision does not 'squarely address' the issue . . . it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue," and the federal habeas court "must defer to the state court's decision." <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009). "Circuit precedent may provide 'persuasive authority' for purposes of determining whether a state court decision is an 'unreasonable application' of Supreme Court precedent", but "only Supreme Court holdings are binding on state courts, and 'only those holdings need be reasonably applied.'" <u>Rodgers v. Marshall</u>, 678 F.3d 1149, 1155 (9th Cir. 2012) (citation omitted).

Under the second AEDPA exception, relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2). "Factual determinations by state courts are presumed correct absent clear and

convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2)." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003); <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007) (The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold").

In applying these standards, the Court looks to the last reasoned state court decision. <u>See</u> <u>Delgadillo v. Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>see</u> <u>also</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991). To the extent no such reasoned opinion exists, as where a state court rejected a claim in an unreasoned order, this Court must conduct an independent review to determine whether the decisions were contrary to, or involved an unreasonable application of, "clearly established" Supreme Court precedent. <u>See</u> <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).

**V.**

**ANALYSIS**

Petitioner contends his federal constitutional right to a fair jury trial was violated on five grounds: (1) trial counsel was ineffective because he - (a) failed to investigate and interview Melanie Patterson, a potential percipient witness, (b) failed to impeach Shantele Marcum, a prosecution witness, (c) failed to request a limiting instruction on information revealed during Petitioner's cross examination, and (d) failed to move for a mistrial; (2) the trial court erred in refusing to instruct the jury on accident; (3) the trial court erred in permitting the prosecutor to question him on cross-examination about his drug procurement for the Miami trip; (4) the trial court erred in instructing the jury on flight; and (5) cumulative error resulted in a denial of due process.

**1.** *Ineffectiveness of Trial Counsel*

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in <u>Strickland v. Washington</u>, 466 U.S. 668, (1984). The benchmark for assessing claims of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1051 (9th Cir. 2003.) (quoting <u>Strickland</u>, 466 U.S. at 686). A petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>Strickland</u>, 466 U.S. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. (<u>Id.</u> at 690); <u>Wiggins v. Smith</u>, 539 U.S. 510, 521, (2003).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (<u>Id.</u> at 694.)  A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (<u>Id.</u>) See also <u>Williams</u>, 529 U.S. at 391-92; <u>Laboa v. Calderson</u>, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice. . . .that course should be followed." <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 697).

13-CV-211-JLS-(PCL)

In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide range of professional assistance.' "Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

In his habeas petition, Petitioner fashions his ineffective assistance claim from a plethora of alleged misconduct. In particular, Petitioner claims that counsel: (a) failed to investigate and interview Melanie Patterson, a potential percipient witness, (b) failed to impeach Shantele Marcum, a prosecution witness, (c) failed to request a limiting instruction, and (d) failed to move for a mistrial. Taking these claims in turn, the Court will address each issue.

### a. Failing to Investigate and Interview a Potential Percipient Witness

Petitioner asserts that his trial counsel, Jason Gregory Turner, failed to investigate and interview Melanie Patterson, a potential percipient witness, even after Petitioner told him not to do so. When Petitioner was interviewed by his counsel before trial, he mentioned there was another person in his apartment on the night of the incident. (Lodgment 14 at 1417-18.) According to his counsel, Petitioner passed over it "very quickly because this was at a time when he had reconciled with his fiancee, [a]nd it was very important [to Petitioner] that this information not see the light of day. So we just let it go." (Id.) As a result, this witness did not testify until Petitioner's current counsel questioned her at the Motion for New Trial. (Id. at 1442.)

During direct examination at the motion for a new trial, Melayni Patterson testified that after a domestic violence incident with her boyfriend in Palm Springs, she drove to San Diego to clear her mind. (Id. at 1443.) While in San Diego she ran into Petitioner at the Green Flash, a restaurant and bar. (Id.) She

13-CV-211-JLS-(PCL)

stated that she knew Petitioner for three years and confided in him regarding her situation with her boyfriend. (Id. 1444-45.) Patterson testified that she didn't have anything to drink, nor take any drugs that night, and accompanied Petitioner back to his apartment. (Id.) During the early hours of Saturday morning, Patterson awoke to voices both inside the apartment and outside. (Id. at 1445-46.) She testified that she was in the Petitioner's bedroom when she heard Petitioner open the door and yell in a loud whisper for the victim to "shut the fuck up." (Id. at 46.) When Petitioner went outside to confront the victim, Patterson testified that she "walked out of the bedroom and into the main area of the apartment where she peeked out of the blinds that were right by the door." (Id.) When asked about the degree of darkness outside, Patterson stated it was pitch dark outside. (Id.) Patterson then described that she saw the victim backpedal in response to the Petitioner and toppled over the bannister. (Id.) She stated that although Petitioner was gesticulating with his arms, there was no contact between him and the victim. (Id.) Patterson also clarified that she was in a position to see the scene clearly and that there was a light on the balcony. (Id.)

However, on cross examination it was revealed that Patterson had a brief prior romantic relationship with the Petitioner. (Id. at 1452.) Patterson explained that it was a fleeting affair and that they were mostly good friends. (Id.) Patterson was then questioned about the details of what she saw that evening, (Id. at 1455.) specifically, where she was standing in reference to the victim and Petitioner. (Id.) Patterson stated that Petitioner's back was to her as he approached the victim waiving his arms and saying "shut the fuck up." (Id. at 1456.) She also explained that the victim was on a slightly lower level because the Petitioner had to take a few steps down to confront him. (Id.) Patterson then stated that after the victim fell she remained in the apartment and did not go outside, call 911, or check up on the situation. (Id. at 1457-58.) She left later that day and did not follow up on the events from the morning. (Id.) Patterson explained that she has seen Petitioner

13-CV-211-JLS-(PCL)

three or four times in public since the incident but never knew there was a pending

case against him. (<u>Id.</u>)

### i. Prejudice under Strickland

As stated above, in assessing prejudice, the question is not whether it is

possible a reasonable doubt might have been established if counsel acted

differently, but whether it is reasonably likely the result would be different.

<u>Harrington v. Richter</u>, ____ U.S. ____, 131 S.Ct. 770,791-92 (2011). "The

likelihood of a different result must be substantial, not just conceivable." (<u>Id.</u> at

792.)  Additionally, as in this case, prejudice based on a failure to investigate

witnesses "must be considered in light of the strength of the government's case."

<u>Rios v. Rocha</u>, 299 F.3d 796, 808-09 (9th Cir. 2002.)

In this instance, the government's case relied upon testimony from two

witnesses who were present at the scene of the incident and whose statements

were made to law enforcement shortly after the incident. Marcum testified that

while she was in Petitioner's apartment, Petitioner went up to the victim in

response to his shouting outside. (<u>Id.</u> at 158-59.) Marcum stated that although she

"never saw a punch, she assumed a punch because of the way Petitioner was upset

and yelling and because of the way he went up to [the victim]." (<u>Id.</u> at 192.) She

stated that while the door was open as Petitioner was approaching the victim, she

had a clear and unobstructed view of the well lit area where the Petitioner and

victim were. (<u>Id.</u> at 193.)  Daria Kasprzak testified that she didn't see the

Petitioner's hand actually make contact with the victim, but that she "saw him

swing at the victim and the victim immediately fell." (<u>Id.</u> at 467.) Kasprzak then

explained that she had a straight-on view but that the victim's back had blocked

her vision of any actual punch. (<u>Id.</u>) She further explained during cross

examination that although she didn't see the exact point of contact she had no

doubt contact was made between Petitioner and the victim due to the way

Petitioner's hands went up and the way the victim's body went over the rail. (<u>Id.</u>

at 479.)

        In addition to the testimonial evidence of those present at the scene, Detective Olson and Officer Minx strengthened the government's case by introducing incriminating statements made by Petitioner. When Detective Olson told Petitioner what he was being charged with in the holding cell hours after the incident, Petitioner spontaneously told Detective Olson "I should not have touched that guy. I don't even know him." (Id. at 768.) Officer Minx testified that although he never took a "formalized statement" from Petitioner, according to his report, Petitioner said something to the effect of chest bumping into the victim. (Id. at 780.) Officer Minx stated that he didn't remember specifically speaking about whether or not they made contact, but "when he told me that he chest-bumped him or got close to chest-bumping him, I had just assumed that they made contact." (Id. at 781.)

        This Court is not convinced that it was an unreasonable application of Strickland for the California courts to conclude that there was no reasonable likelihood the jury would reach a different outcome. Although Patterson's testimony supports the conclusion that Petitioner didn't make contact with the victim, given her vantage point behind Petitioner, her testimony is not compelling enough to create a substantial likelihood that the result of Petitioner's trial would be different. Patterson's testimony is not exculpatory, nor does it shed any direct and definitive light on Petitioner's innocence. As stated in Respondent's brief, the issue at trial was whether Petitioner made contact with the victim, or whether the victim fell over by himself. Patterson's testimony would not have added any definitive or conclusive evidence on the critical issue.

        Since the addition of Patterson's testimony isn't compelling enough to create a substantial likelihood of a different result, Petitioner has not satisfied the prejudice prong of Strickland. Accordingly, this Court recommends that Petitioner's claim regarding failure to investigate and interview be **DENIED**.

13-CV-211-JLS-(PCL)

### b. Failing to Impeach a Prosecution Witness

The second argument Petitioner asserts to establish a claim of ineffective assistance of counsel is counsel's failure to impeach Shantele Marcum. Petitioner claims there were two critical instances where trial counsel failed.

The first instance involves an allegedly false statement made by Marcum to the police on the night of the incident. There, Marcum told police that Escajeda was at Petitioner's residence, when in fact, Escajeda was not at Petitioner's residence.  Petitioner argues that had trial counsel impeached Marcum with this false statement it would have had an impact on the jury. [Doc. No. 1 at 30.]

The second instance involves Marcum's alleged statement to Escajeda several hours after the incident that the victim "fell off the balcony." (Lodgment 14 at 1463.) Petitioner emphasizes that Marcum's statement to Escajeda describing the incident as a "fall" rather than an assault and battery is extremely damaging to the prosecution's case and should have been presented to the jury. Petitioner also claims that Marcum was primarily interested in discussing a white dress she borrowed from Escajeda rather than the victim's condition.

After reviewing the trial transcripts, this Court is not persuaded by Petitioner's argument that failing to impeach Marcum with her prior inconsistent statement to the police, and her vague comments to Escajeda over the phone, created prejudice within the meaning of Strickland.

During cross examination, Petitioner's trial counsel questioned Marcum regarding her visit to Petitioner's apartment. (Lodgment 14 at 154.) There, Marcum stated that she chatted with Petitioner about Escajeda for several minutes and never testified that Escajeda was present at Petitioner's apartment. This testimony conflicts with a police report that was given at the time of the incident. However, even if Petitioner's trial counsel brought this inconsistency to light, the effect on the jury would have been minimal since this inconsistent statement had nothing to do with her observations of Petitioner and the victim. Furthermore, the

13-CV-211-JLS-(PCL)

jury did hear testimony evidence from Escajeda that in her opinion Marcum "was not a trust worthy person." (Lodgment 14 at 557.) Therefore, the lack of impeachment with respect to Marcum's statement to the police is seen by this Court as harmless error.

Secondly, Marcum's statement that the victim "fell" could be reasonably viewed as consistent with the prosecution's case that Petitioner made contact with the victim and he fell over the railing. There is nothing in the record that suggests that Marcum and Escajeda had a detailed conversation regarding the facts of that evening. As a result, the evidentiary value of Marcum's comment for the defense's case is significantly diminished. This fact, coupled with testimony from Marcum and Kasprzak describing their observations of Petitioner's conduct and description of how the victim went over the railing, strongly supports the conclusion that there is no reasonable likelihood the result would be different. Accordingly, this Court recommends that Petitioner's claim regarding failure to impeach be **DENIED**.

### c. Failing to Request a Limiting Instruction

The third argument Petitioner asserts to establish a claim of ineffective assistance of counsel was his failure to ask for a limiting instruction after Petitioner was cross examined on his having procured the cocaine he allegedly was selling. (Lodgment 1 at 30.)

At trial, Marcum testified that Petitioner was a drug dealer who sold cocaine to her on several occasions, including on a recent trip to Miami. (Lodgment 14 at 52, 80.) She also explained that on the night of the incident, upon her request, Petitioner told her that she could come over to get cocaine. (Lodgment 14 at 53, 58.) However, during Petitioner's direct examination, he testified that he's not a drug dealer, never sold cocaine to Marcum, and never spoke to her on the phone on the morning of the incident. (Lodgment 14 at 602-08.) Subsequently, on cross examination, the prosecutor inquired into Petitioner's prior procurement of

cocaine. The prosecutor asked Petitioner how he acquired the cocaine for the Miami trip, and whether he sold any of the drugs. (Lodgment 14 at 720-27.) Despite trial counsel's objections on relevancy, cumulative, and prejudial grounds, the trial court ruled that the prosecutor could make a "limited inquiry" into this topic to establish Petitioner's credibility. (Lodgment 5 at 30-31.)

Petitioner now argues that trial counsel's failure to move for a limiting instruction to keep evidence of other crimes from the jury amounted to ineffective assistance of counsel. (Lodgment 1 at 30.) He states that trial counsel should have asked the trial judge to instruct with CALCRIM No. 375[1], which orders the jury not to conclude from the other crimes evidence that the defendant has a bad character or is predisposed to commit a crime. (Lodgment 1 at 31.) In response, Respondent argues that the prosecutor only initiated this line of questioning to attack the defendant's credibility and display his propensity to lie. [Doc. No. 5 at 22.]

In considering Petitioner's argument, federal courts may not interfere with a state evidentiary ruling but only consider whether the evidence was so prejudicial that its admission violated fundamental due process and the right to a fair trial. Fuller v. Roe, 182 F.3d 699, 703 (9th Cir. 1999). As such, this Court will focus on whether trial counsel's failure to ask for a limiting instruction amounted to ineffective assistance of counsel.

After reviewing transcripts of direct and cross examinations, this Court is not persuaded by Petitioner's argument that failing to ask the trial court for a limiting instruction created prejudice within the meaning of Strickland. As the California Court of Appeal noted, even if the trial court exercised its discretion under California Evidence Code § 352 to narrow the scope and length of the prosecutor's cross-examination about Petitioner's procurement of cocaine, the

---

1. CALCRIM 375 is designed to limit the jury consideration of uncharged acts to prove identity, intent, motive, knowledge, credibility.

jury was presented with other admissible evidence that Petitioner had provided cocaine to Marcum on other occasions. (Lodgment 5 at 32.) Consequently, despite trial counsel's objections, the jury would have heard about Petitioner's involvement in procuring cocaine for the trip to Miami. Additionally, Petitioner's involvement in cocaine related activity was a relative minor issue compared to the issue of whether or not Petitioner pushed the victim over the railing. The prosecution mainly inquired into Petitioner's cocaine related activity to attack his credibility as a witness and establish foundation for Marcum visiting Petitioner's apartment. Accordingly, this Court recommends that Petitioner's claim regarding failure to request a limiting instruction be **DENIED**.

### d. Failing to Move for a Mistrial

The fourth argument Petitioner asserts to establish a claim of ineffective assistance of counsel, is that trial counsel's failure to move for a mistrial based on Petitioner's cross examination on the cocaine procurement issue, was prejudicial. Petitioner invokes the same argument and facts presented in his third argument of failing to request a limiting instruction. As the Court stated above, trial counsel's failure to move for a mistrial based on the cross examination of Petitioner on his prior drug procurement does not create prejudice within the context of Strickland. Petitioner has not demonstrated prejudice sufficient to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Assuming arguendo, testimony regarding Petitioner's prior drug procurement was not presented to the jury, the jury still had ample evidence including testimony from Marcum, Kasprzak, Detective Olson and Officer Minx to convict Petitioner of battery. Accordingly, this Court recommends that Petitioner's claim regarding failure to move for a mistrial be **DENIED**.

For the reasons stated above this Court recommends that ground one regarding his ineffective assistance of counsel claim be **DENIED** in its entirety.

13-CV-211-JLS-(PCL)

### 2. Refusing to Instruct the Jury on Accident or Misfortune

In ground two, Petitioner contends that the trial court's failure to instruct on accident or misfortune prejudicially deprived Petitioner of his federal constitutional right to present a defense. [Doc. No. 1 at 44.] Respondent argues that Petitioner's claim should be dismissed because: (1) this is not a federal question for which relief may be granted; and (2) the California courts' rejection of the claim is entitled to deference and is not contrary to, nor an unreasonable application of United States Supreme Court precedent on the facts presented. (Lodgment 5, at 28.)

The trial court, at the close of evidence, instructed the jury with CALCRIM 875, which as read to the jury, stated:

> **875. Assault with Deadly Weapon or Force Likely to Produce Great Bodily Injury**
>
> The defendant is charged in Count 1 with assault with force likely to produce great bodily injury.
>
> To prove that the defendant is guilty of this crime, the People must prove that:
>
> 1A. The defendant did an act that by its nature would directly and probably result in the application of force to a person, and
>
> 1B. The force used was likely to produce great bodily injury;
>
> 2. The defendant did that act willfully;
>
> 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone;
>
> AND
>
> 4. When the defendant acted, he had the present ability to apply force likely to produce great bodily injury to a person.
>
> Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.
>
> The terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind.

13-CV-211-JLS-(PCL)

The touching can be done indirectly by causing an object [or someone else] to touch the other person.

The People are not required to prove that the defendant actually touched someone.

The People are not required to prove that the defendant actually intended to use force against someone when (he/she) acted.

No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault, and if so, what kind of assault it was.

The following term great bodily injury is defined in another instruction to which you should refer."

**925. Battery Causing Serious Bodily Injury**

The defendant is charged in Count 2 with battery causing serious bodily injury.

To prove that the defendant is guilty of this charge, the People must prove that:

1. The defendant willfully touched Ajmal Wardak in a harmful or offensive manner;

AND

2. Ajmal Wardak suffered serious bodily injury as a result of the force used.

Someone commits an act willfully when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage.

Making contact with another person, including through his or her clothing, is enough to commit a battery.

A *serious bodily injury* means a serious impairment of physical condition. Such an injury may include: loss of consciousness, concussion, and bone fracture.

The touching can be done indirectly by causing an object to touch the other person."

(Lodgment 1 at 74-76.)

On direct review, the California Court of Appeal rejected Petitioner's instructional error claim, as follow:

Defendant argues the trial court erred in refusing his request that the jury be instructed on the defense of accident. (See CALCRIM No.

3404.) As we shall explain, the charged offenses in this case (assault and battery with personal infliction of great bodily injury) do not require an intent to harm the victim. Further, to support an accident defense, there must be accidental conduct *by the defendant*, not merely accidental conduct *by the victim*. Thus, to the extent defendant's contentions rest on claims that there was evidence to support that he had no intent to hurt the victim and that the victim (as opposed to defendant) engaged in accidental conduct, they are unavailing.

Assault and battery are general intent crimes, requiring that the defendant commit the proscribed act willfully; i.e., on purpose. (People v. Williams, supra, at p. 782; People v. Colantuono, supra, at pp. 213-214; People v. Lara (1996) 44 Cal. App. 4th 102, 107; People v. Ibarra (2007) 156 Cal.App.4th 1174, 1194.) Further, the defendant must have had knowledge of facts that would lead a reasonable person to realize the application of force was likely to result from the act. (People v. Williams, supra, at p. 788.) Thus, an accident defense can apply to charges of assault or battery when the defendant unwillingly or unknowingly (i.e., accidentally) directed force towards, or touched, the victim. (See, e.g., People v. Lara, supra, at p. 106 [accident defense applicable based on evidence showing victim grabbed defendant, and defendant then unintentionally hit victim while turning around to free himself]; People v. Gonzales (1999) 74 Cal. App. 4th 382, 385, 390 [accident instruction supported by evidence showing defendant accidentally struck victim with door when he entered room as victim was leaving].)

At trial, defendant argued an accident instruction was warranted based on evidence showing he had no intention to cause harm and the incident occurred because the victim recoiled in response to his approach. The court concluded the accident defense did not apply because there was no evidence that defendant engaged in any involuntary conduct. Similar to his arguments to the trial court, on appeal defendant asserts an accident defense was supported by evidence showing that he went outside his apartment with no wrongful intent but merely to tell the victim to stop yelling, and the incident occurred because the inebriated victim accidentally fell over the railing when defendant approached him. To the extent defendant is asserting an accident defense based on evidence showing he did not intend to cause harm to the victim, this showing would not refute the assault or battery charges in this case. Intent to harm is not an element of assault or battery; all that is required is knowledge of the relevant facts and intent to do the act that is likely to, or does, result in the application of the wrongful force. (See People v. Williams, supra, 26 Cal.4th at pp. 782, 786, 790 [assaultive act, by its nature, subsumes intent to injure.])

It is apparent from the record that the jury understood that defendant was liable for assault or battery only if the prosecution proved that he acted purposefully instead of accidentally. The jury was instructed that the offenses of assault and battery required the prosecution to prove that defendant did the act or touching "willfully" and that he was "aware of facts" reasonably showing the application of force was likely. The instructions provided to the jury explained that defendant commits an act willfully when "he or she does it willingly or on purpose." (See CALCRIM Nos. 915, 925.) We assume the jurors understood and followed the court's

instructions. (<u>People v. Gray</u> (2005) 37 Cal.4th 168, 231.) Based on the instructions provided to the jury requiring that defendant act willingly and on purpose, we have no doubt the jury understood that it could not find defendant guilty unless it was convinced beyond a reasonable doubt that his conduct was purposeful, not accidental.

(Lodgment 5 at 16-20.)

Generally, a claim that a state trial judge gave erroneous jury instructions is not cognizable in a federal habeas action unless the instruction "so infected the entire trial that the resulting conviction violates due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned', but that it violated some [constitutional] right." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Further, "[i]t is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." Estelle, 502 U.S. at 72 (1991), quoting <u>Cupp</u>, 414 U.S. at 147.

When a petitioner challenges the admission of particular evidence, reviewing federal courts will not find a due process violation as long as the challenged evidence is relevant to an issue in the case and a permissible inference can be drawn from that evidence. <u>Estelle</u>, 502 U.S. at 70; *see* <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 920 (9th Cir. 1991) (Where several inferences arise from admitted evidence, the jury is relied upon to "sort them out in light of the court's instructions"); *see also* <u>Lisenba v. California</u>, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941) ("The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence whether true or false"). "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process."<u>Jammal</u>, 926 F.2d at 920; *see also* <u>Larson v. Palmateer</u>, 515 F.3d 1057,

13-CV-211-JLS-(PCL)

1065 (9th Cir. 2008) (For purposes of federal habeas review, it is "irrelevant" whether the trial court's evidentiary ruling is correct or not under state law; the only question "is whether the ruling rendered the trial so fundamentally unfair as to violate due process") (citation omitted). Even when the state trial court's erroneous evidentiary ruling is found to have violated the defendant's constitutional rights, the error is still evaluated by federal habeas courts under the <u>Brecht</u> "substantial and injurious effect or influence" on the jury's verdict standard. <u>Baines</u>, 204 F.3d at 977.

In this case, the jury was instructed that the offenses of assault and battery required the prosecution to prove that Petitioner did the act or touching "willfully." The instructions provided to the jury explained that a defendant commits an act willfully when "he or she does it willingly or on purpose." (Lodgment 5 at 74, 76.) The instructions did not alter or diminish the burden of proof requiring the jury to find that Petitioner acted willingly and on purpose.

Given these instructions, the California Court of Appeal's reasoning is not clearly contrary to any United States Supreme Court precedent. The court found that, pursuant to California law, the trial court's refusal to instruct on accident was without import because the trial court stated to the jury that if it did not find that Petitioner acted purposely or willingly, it could not convict him of assault or battery. As such, this instruction did not render Petitioner's trial fundamentally unfair since it required the jury to find all elements necessary to convict for the crimes alleged. Accordingly, this Court recommends that ground two regarding failure to instruct on accident or misfortune be **<u>DENIED</u>**.

### 3. Cross Examination of Prior Drug Procurement

In ground three, Petitioner contends that the court erred when it allowed the prosecution to cross examine Petitioner on "irrelevant" and "highly prejudicial" testimony relating to his drug procurement for an unrelated recent trip to Miami. [Doc. No. 1 at 53.] In response, Respondent asserts that since Petitioner testified,

13-CV-211-JLS-(PCL)

any evidence bearing on his credibility is relevant. [Doc. No. 5 at 33.] Specifically, since Petitioner's testimony contradicted the prosecution witness's testimony, it opened himself to scrutiny on this subject. (Id. at 33.)

When a petitioner asserts a due process violation based on admission of evidence, a federal habeas court is limited to determining whether the challenged evidence "rendered the trial so fundamentally unfair as to violate due process." Windham, 163 F.3d at 1103; accord Larson v. Palmateer, 515 F.3d 1057, 1065 (9th Cir.2008). But "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir.2009) (citing 28 U.S.C. 2254(d)).

Here, although Petitioner cites the "fundamentally unfair" standard in Estelle, he fails to cite any other applicable Supreme Court precedent or controlling authority, and instead expressly relies on California rules of civil procedure. [Doc. No. 1.] Since the state courts addressed and rejected Petitioner's evidentiary claims (Lodgment 5 at 32), this Court will not second-guess the state court's conclusion on an issue of state law. McGuire, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") As a result, Petitioner's evidentiary claims are not cognizable and do not present a federal question.

Even if Petitioner's claims were cognizable on habeas review, they would not warrant relief. As stated by the California Court of Appeals decision, any error in this regard was not prejudicial. Considering the record as a whole, since the jury was presented with other admissible evidence that Petitioner had provided cocaine to Marcum on a separate occasion, this Court finds that the cross-examination about Petitioner's procurement of cocaine for the Miami trip was relatively

innocuous.  Accordingly, this Court recommends that ground three regarding improper cross examination be **DENIED**.

### 4. Jury Instruction on Flight

In ground four, Petitioner contends that the court erred by giving the jury a flight instruction according to CALCRIM § 372. [Doc. No. 1 at 55.] Respondent argues that Petitioner's fourth claim should be dismissed because: (1) this is not a federal question for which relief may be granted; and (2) the California courts' rejection of the claim is entitled to deference and is not contrary to, nor an unreasonable application of United States Supreme Court precedent on the facts presented. (Lodgment 5, at 35-37.)

According to the California Court of Appeal decision, after the victim fell on his head, the Defendant picked up the victim and put him in the front seat of a car in order to take him to the hospital. (Lodgment 5 at 6.) The Defendant did this despite several requests from Marcum and Kasprzak to call 911. (Id.) Kasprzak also testified that the Defendant grabbed and shook her when she stated they needed to call the police. (Id.) As the Defendant was backing the car into the street, he was stopped by the police in response to a 911 call by a neighbor. (Id.)

The trial court, at the close of evidence, instructed the jury with CALCRIM § 372, which as read to the jury, stated:

"If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled or tried to flee, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled or tried to flee cannot prove guilt by itself."

(Lodgment 1 at 72.)

As stated above, jury instructions will not be subject to federal review unless they, "so infected the entire trial that the resulting conviction violates due process." Estelle v. McGuire.

In this case, the flight instruction stated that if the jury found Petitioner tried to flee, it could consider that as part of the evidence. The instruction also stated that "evidence that the defendant fled or tried to flee cannot prove guilt by itself." Given the phrasing of the instruction, and the facts, the prosecution was entitled to a flight instruction. Therefore, this Court recommends this claim be **DENIED**.

## 5. Cumulative Error

In his final claim, Petitioner contends that the cumulative effect of the errors asserted in grounds one, two, and three, and four violated his right to due process. [Doc. No. 1.] On appeal, the California Court of Appeal rejected Petitioner's cumulative error claim, stating:

> the evidentiary items omitted by defense counsel (i.e., the testimony of the women at defendant's apartment and Marcum's pretrial statement to her friend) did not shed direct, definitive light on the key disputed contention of whether defendant touched the victim, and there is no reasonable probability that this evidence would have altered the jury's conclusions. Concerning the claims of instructional error, it is clear from the record that the jury understood culpability could not be based on accidental conduct by defendant; the jury was not told to apply a proximate causation standard to the great bodily injury enhancement; and the evidence warranted submitting the issue of flight to the jury. Finally the prosecutor was entitled on cross-examination to challenge the veracity of defendant's testimony concerning his cocaine procurement, and to the extent the court should have curtailed the length of this cross-examination, it did not provide the jury with any new evidence of misconduct that the jury did not know about from other, admissible testimony.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair, even where each error considered individually would not require reversal." Parle v. Runnels, 505 F.3d 922, 928 (9th Cir.2007); see

also <u>Alcala v. Woodford</u>, 334 F.3d 862, 893 (9th Cir.2003); <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002). "[T]he fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' ... and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." <u>Parle</u>, 505 F. 3d at 928 (internal citations omitted).

The California Court of Appeal addressed each of the alleged errors that Petitioner contends together give rise to cumulative error and found no cumulative error. Similarly, this Court reviewed all of Petitioner's contentions and found no resulting error. Therefore, this Court recommends Petitioners claim of cumulative error be **<u>DENIED</u>**.

## VI.

## CONCLUSION

This report and recommendation is submitted to the Honorable Janis L. Sammartino, the United States District Judge assigned to the case, pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before November 21, 2013. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before December 19, 2013. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.1991).

**IT IS SO ORDERED**.

DATE: October 24, 2013

_____
Peter C. Lewis
United States Magistrate Judge

13-CV-211-JLS-(PCL)